(77 South. 12)

MANCHURIA S. S. CO. v. HARRY G. G. DONALD & CO. et al. (1 Div. 991.)

(Supreme Court of Alabama. Nov. 15, 1917.)

1. APPEAL AND ERROR ☞931(1)—REVIEW—FINDINGS OF CHANCELLOR.

The rule that under Gen. Acts 1915, p. 705, providing for taking of oral testimony before the chancellor, the same presumptions must be indulged in favor of the chancellor's findings as are accorded to a finding of fact by the register, has no application to a case in which testimony was taken orally in open court before the chancellor, and transferred to the circuit court, where decree was rendered by a judge who did not hear such oral evidence.

2. JUDGMENT ☞776—LIEN—REGISTRATION—STATUTE.

A judgment registered as required by Code 1907, §§ 4156, 4157, in the office of the judge of probate of the county, is intended to have the effect of an execution in the hands of the sheriff as an instrumentality of creating and preserving a lien on all defendant's property in the county subject to levy and sale on execution.

3. EQUITY ☞324—PLEADING AND PROOF.

In equity, appropriate pleading is as essential to the enforcement of a right as proof is necessary to support such pleading; proof without pleading being generally ineffectual.

4. FRAUDULENT CONVEYANCES ☞241(3)—BILL TO SET ASIDE—MAINTENANCE BY CREDITOR WITHOUT LIEN.

In proper case, a creditor without a lien may successfully maintain a bill to set aside a fraudulent conveyance, if the pleadings and proof bring the right of the creditor within the purview of the statute.

5. LIENS ☞22—LACK OF PROVISION FOR FORECLOSURE—EQUITABLE JURISDICTION.

Though an instrument provides no method of enforcing or foreclosing a lien secured thereby, a court of equity exercising original jurisdiction has power to protect and foreclose such lien.

6. CHATTEL MORTGAGES ☞52—SECURITY FOR FUTURE ADVANCES.

A chattel mortgage given to secure future advances for the prosecution of the mortgagor's business is valid, though not declaring its purpose on its face.

7. EVIDENCE ☞419(10) — MORTGAGE TO SECURE FUTURE ADVANCES—SHOWING CHARACTER BY PAROL.

That a mortgage was given to secure future advances for the prosecution of the mortgagor's business, not expressed on the face of the mortgage, may be shown by parol to make the instrument operate as such security.

8. FRAUDULENT CONVEYANCES ☞109—RESERVATION OF BENEFIT BY TRANSFEROR—EVIDENCE OF FRAUD.

Generally, the provision in a transfer of property by a person indebted, whereby he reserves or secures a benefit to himself or family at the expense of his creditors, unless it be consented to by them, is deemed evidence of fraud, actual or constructive, rendering the transfer liable to be avoided by creditors.

9. FRAUDULENT CONVEYANCES ☞208, 274—BURDEN TO PROVE FRAUD—PROOF AND PRESUMPTION.

The right of a subsequent creditor to avoid a conveyance as fraudulent depends on the existence of fraud in the transaction, and the burden to prove it is on such creditor, and such fraud must be proved, and will not be presumed if the circumstances in evidence may be consonant with honesty in the parties to the conveyance.

10. FRAUDULENT CONVEYANCES ☞299(2)—ACQUISITION OF PROPERTY BY DEBTOR WITH TRANSFEREE'S MONEY—SUFFICIENCY OF EVIDENCE.

In suit by a judgment creditor of a lumber dealer, to set aside as fraudulent a mortgage executed by the dealer to a lumber company to secure future advances, evidence held to show that the stock of lumber in the dealer's possession when the mortgage was executed had been acquired by the dealer through payments made with the lumber company's money or credit, so as to subject it to the terms of a prior contract between the dealer and the company.

11. CHATTEL MORTGAGES ☞240 — TAKING POSSESSION OF PROPERTY COVERED—EFFECT.

Where other creditors are interested, or, in the absence of agreement to the contrary, if a mortgagee holds two mortgages on properties of the same mortgagor, and the latter delivers to him property covered by both mortgages, the reasonable market value of the property, or the proceeds of sale under the mortgage, must be applied as provided in the instrument first conveying, and if the property seized or sold is conveyed by only one mortgage, the property or its proceeds must be applied by the mortgagee to the debt evidenced by the mortgage that constitutes a lien on the property.

12. FRAUDULENT CONVEYANCES ☞81—MORTGAGE TO SECURE FUTURE ADVANCES—INTEREST IN MORTGAGOR IN PROPERTY COVERED.

A mortgage covering property incumbered by purchase money or other prior liens to its market value was not fraudulent and void as to the mortgagor's judgment creditor under Code 1907, § 4293, since a necessary element of a fraudulent conveyance is, that the debtor must have conveyed some substantial portion of his property that was subject to the satisfaction of the creditor's debts.

Appeal from Circuit Court, Mobile County; Norvelle R. Leigh, Jr., Judge.

Bill in equity by the Manchuria Steamship Company against Harry G. G. Donald & Co. and others. From a decree dismissing complainant's bill, complainant appeals. Affirmed.

Harry T. Smith & Caffey, of Mobile, for appellant. Stevens, McCorvey & McLeod, of Mobile, for appellees.

THOMAS, J. The bill was filed in the chancery court by an alleged judgment creditor, to set aside as fraudulent a paper writing executed on February 10, 1910, by H. G. G. Donald, to the McGowin Lumber & Export Company, a corporation.

A portion of the evidence was taken orally, in open court, before the chancellor. Gen. Acts 1915, p. 705; Andrews v. Grey, 74 South. 62.[1] By operation of law the chancery court ceased to exist after January 14, 1917; and pending causes were transferred to the circuit court for trial or decision. Ex parte City Bank & Trust Co., 76 South. 372;[2] Ex parte State ex rel. Attorney General, 73 South. 101;[3] Gen. Acts 1915, p. 279.

[1] The rule declared in Andrews v. Grey, supra, has no application to a submission on testimony taken orally, in open court, before the chancellor, where the decree is rendered by the judge of the circuit court, who did not hear such oral evidence. On September 7,

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

[1] 199 Ala. 152.　　[2] Ante, p. 440.　　[3] 197 Ala. 570.

1908, H. G. G. Donald, doing business under the firm name of H. G. G. Donald & Co., entered into a written agreement with the McGowin Lumber & Export Company, whereby the latter was to furnish certain moneys, to be used in the purchase of lumber and logs, and in paying the necessary expenses of the conduct of the sale and export business of the first named. In the text of this opinion these parties will hereafter be referred to respectively as Donald and the McGowin Company.

By the instrument in question, Donald mortgaged to the McGowin Company his boom equipment and office fixtures, which latter were therein described as being in Mobile, Ala. The articles enumerated (constituting the boom equipment), used by Donald in handling, selling, and exporting timber and lumber, were not so described. The instrument, which was to remain of effect till January 1, 1910, was duly acknowledged, and was thereafter filed for record in the probate office of Mobile county on September 9, 1908. After the expiration of this agreement (February 10, 1910), said parties executed a second writing of like general effect, which was also duly acknowledged, and recorded in the office of the judge of probate of Mobile county on February 23, 1910.

The validity of the first instrument is not challenged; the assignments of error being specifically directed to the decree of the court, giving force and effect to the second instrument, and dismissing complainant's bill as last amended. Appellant's counsel clearly state the purpose of the bill with regard to the challenged instrument and the conduct of the business of the parties thereunder. It was to hold the McGowin Company to account for "the proceeds of lumber, timber, and other property which it received from Donald under a contract, partially written and partially verbal: First, because complainant was entitled to a statutory judgment lien, which it is entitled to enforce in equity against the McGowin Lumber & Export Company, who undertook to destroy it; second, because the transfer to the McGowin Lumber & Export Company was void as against the complainant, since it was intended to hinder, delay, and defraud the creditors of Donald."

[2] The amended bill does not aver when his debt became existent, but only that it was reduced to judgment in the United States District Court, in Alabama, on the 29th day of April, 1909; that this judgment was registered in the office of the judge of probate of Mobile county on February 12, 1910, under the provisions of section 4157 of the Code. A judgment, registered as required by statute, is intended to have the effect of an execution in the hands of the sheriff, "as an instrumentality of creating and preserving a lien" (Reynolds v. Collier, 103 Ala. 245, 15 South. 603; Enslen v.

Wheeler, 98 Ala. 200, 13 South. 473; Decatur, etc., Works v. Moses, 89 Ala. 538, 7 South. 637; Street, Ex'r, v. Duncan, 117 Ala. 571, 23 South. 523; Crawford Merc. Co. v. Anderton, 179 Ala. 573, 60 South. 874) "on all the property of the defendant in the county where filed, which is subject to levy and sale under execution" (Code, §§ 4156, 4157; Jordan v. N., C. & St. L. Ry., 131 Ala. 219, 221, 31 South. 566; Duncan v. Ashcraft, Adm'r, 121 Ala. 552, 25 South. 735). Appellee insists that the bill fails to show the lien of a registered judgment, since it is not specifically averred therein that any of the properties in question were ever within Mobile county after the registration of the judgment.

[3] In equity, appropriate pleading is as essential to the enforcement of a right as proof is necessary to support such pleading. Proof without pleading is generally ineffectual. Sims' Ch. § 200; Overton v. Moseley, 135 Ala. 599, 33 South. 696; Rapier v. Gulf City Paper Co., 64 Ala. 330; S. & N. A. R. R. Co. v. H. A. & B. R. R. Co., 117 Ala. 395, 23 South. 973; Cockrell v. Gurley, 26 Ala. 405; McKinley v. Irvine, 13 Ala. 693. The cases holding that equity may enforce a lien of necessity deal with existing property, subject to the lien, within the jurisdiction of the court. Wynn v. Bank, 168 Ala. 469, 53 South. 228; Enslen v. Wheeler, supra; Code, § 4157. Though the judgment of complainant is averred to have been registered in Mobile county on February 12, 1910, yet the averment not being specific, that any of the properties sought to be conveyed by the instrument in question, or to be subjected to said judgment, were in said county on or after said date, no lien of a registered judgment is shown to have attached thereto. It is true that the instrument challenged by the bill (that of February 10, 1910) recited that, on the date of its execution the office fixtures were within said county; yet it does not follow that said property remained in said county until the registration of the judgment on February 12, 1910 (though it may be that such was the fact).

[4] However this may be, we will decide the main question presented by the appeal, since, in a proper case, a creditor without a lien may successfully maintain a bill to set aside a fraudulent conveyance. Gurley v. Robertson, 178 Ala. 325, 332, 59 South. 643. But the pleading and proof must bring the right of such creditor within the purview of the statute. In McCrory v. Donald, 192 Ala. 312, 68 South. 306, authorities are collected, to the effect that a subsequent creditor cannot have set aside a conveyance of properties executed by his debtor, as fraudulent as to himself, except upon proof that the conveyance was made with the specific intention to defraud subsequent creditors, and was accepted by the grantee to assist the debtor in his fraudulent purposes, and that a fraud

was thus committed which was injurious to the attacking creditors.

The evidence is without conflict that the instrument of date February 10, 1910, was executed for the purpose of continuing in force till January 1, 1912, the original agrée-ment between the parties; it being of prac-tically the same import, except as to period of operation and as to the original instru-ment's being a first lien on the properties thus conveyed. The substance of this sec-ond instrument was that H. G. G. Donald, do-ing business under the name of H. G. G. Don-ald & Co., engaged in exporting timber and lumber, was without sufficient capital to car-ry on that business, and that the McGowin Lumber & Export Company undertook to as-sist the said Donald financially—by indorsing or otherwise guaranteeing H. G. G. Donald & Co.'s. paper—at such times and in such amounts as the McGowin Company should de-termine, but only upon receiving the security created or provided by said instrument; that the title to all timber and lumber thereafter purchased by Donald with the funds so loan-ed or guaranteed should vest and remain in the McGowin Company until the lumber should be loaded upon vessels and bill of lad-ing, with the usual draft attached, obtained, and delivered to the McGowin Company; that Donald and the McGowin Company should negotiate said drafts, and use so much of the proceeds as should be necessary in re-paying the loans by the McGowin Company made to Donald and paying all papers indors-ed or otherwise guaranteed for H. G. G. Don-ald or for his firm, and in paying the com-pensation to which the McGowin Company should be entitled under the terms of the in-strument. By the agreement the compensa-tion for all services and aid which the Mc-Gowin Company might render Donald under the terms of the instrument was fixed at "5 per cent. of 90 per cent. of the invoice value of each cargo of lumber or timber shipped by the said Donald while this agreement is in force, and also 5 per cent. of the net profit of the charter of each vessel loaded by said Donald while this agreement is in force." The agreement further provided that to se-cure all liabilities accruing to McGowin Com-pany under said engagement, Donald mort-gaged thereby his boom equipment and office furniture, described as follows:

"All of the office furniture and fixtures which he now has in his office in Mobile, Ala., or which he may place therein before January 1, 1912. Also all chains, dogs, ropes and other tools, utensils and appliances, owned by said Donald and used in the business of handling, selling and exporting timber and lumber. Also all other articles of like kind which he may ac-quire before the 1st day of January, 1912."

It was further covenanted therein that Donald would not purchase or handle any timber or lumber during the life of the con-tract "except that which is so acquired as to be covered by the terms of this agreement";

and was declared that the purpose of this lat-ter paragraph was "to let all persons know that all timber and lumber which the said Donald may have at any time during the life of this contract is embraced in and by the terms hereof. " It was further stipulated that the provision of the instrument having the ef-fect of passing the title to said timber and lum-ber to the McGowin Company was not intend-ed to operate as an absolute conveyance thereof, but to operate as "a conveyance in the nature of a mortgage to secure all sums the said Donald may be owing to the said McGowin Lumber & Export Company for services or for loans, indorsements, or guar-antees made to or for the said Donald in carrying on his said business; it being the in-tention [of the instrument] that the said in-dorsements or guarantees shall be counted as liabilities to the said McGowin Lumber & Export Company from the said Donald at all times." The further declared purpose of the instrument was "to fully secure the said McGowin Lumber & Export Company against all loss by virtue of said loans, indorsements or guarantees, and also to secure to it the payment of its compensation for its services." It was by the instrument further provided that Donald should keep the McGowin Com-pany "fully posted" as to his various trades, and should not conclude any sales or pur-chases of timber without securing the approv-al and consent in writing of the said McGow-in Company, nor ship any timber or lumber covered by the lien fixed thereon by virtue of the provisions of said contract without the written consent of said company. It was further agreed that all bills and drafts for the proceeds of lumber shipped, and the ac-companying bills of lading, bearing the guar-antee of the said company by indorsement or otherwise, should remain subject to the con-trol and orders of the said McGowin Com-pany until accepted and fully paid by the drawees; and that nothing in the instrument should authorize Donald to bind said company "upon or by any contract or agreement" which the said Donald might make. It was then provided that:

"Should the said Donald violate any of the terms hereof, or fail in any way to turn over to the said McGowin Lumber & Export Company all bills of lading for each shipment that he may make, the said McGowin Lumber & Export Company shall be authorized to take all of the property embraced within the terms hereof, and sell the same at a private or public sale, as it deems best, and in any manner that it may determine upon, paying from the proceeds: (1) All of its expenses incurred in the seizing and selling of said property, including its attorneys' fees; (2) whatever may be owing to it, by the said Donald, or upon any paper indorsed or guaranteed by it for the said Donald; (3) ac-counting to the said Donald for any surplus of said proceeds that may then remain."

The instrument concluded with the recital that Donald was then indebted to the company by virtue of transactions under a similar con-tract which expired on January 1, 1910, and

in which the said office furniture, together with said boom, dogs, chains, etc., were mortgaged; and that the mortgage embraced in the aforesaid contract (that of date February 7, 1908) was not altered or affected but should stand in full force and virtue, and that the instrument of February 10, 1910, should be treated as a second mortgage in so far as concerned the said property embraced in the first mortgage which was thereby expressly continued in full force.

[5] To the insistence made that the instrument contains no sufficient provision for foreclosure on default of the mortgage, as to some of the properties embraced therein, or as to any of the stipulations thereof, we may say that though an instrument provides no method of enforcing or foreclosing a lien secured thereby, a court of equity exercising original jurisdiction has power to protect and foreclose such lien. Boyett v. Hahn et al., 73 South. 79, 197 Ala. 439.

[6] The future advances sought to be secured by the contract were specified with reasonable accuracy, and were designed for a legitimate purpose. The right of a mortgagor to secure future advances for the prosecution of his business has been often recognized by this court, and, in fact, it is not controverted by counsel in this case. And it has been declared that it is not necessary to its validity that a mortgage given to secure future advances should declare on its face such purpose. Kirby v. Raynes, 138 Ala. 194, 35 South. 118, 100 Am. St. Rep. 39; Collier & Jones v. Wood Bros., 85 Ala. 91, 4 South. 840; Huckaba v. Abbott, 87 Ala. 409, 6 South. 48; Hill v. Nelms, 86 Ala. 442, 5 South. 796; Marks v. Robinson, 82 Ala. 69, 2 South. 292; Lawson v. Ala. Warehouse, 80 Ala. 341; Collier v. Faulk, 69 Ala. 58; Wilkerson v. Tillman, 66 Ala. 532, 537; Lovelace v. Webb, 62 Ala. 271.

Dealing with a conveyance securing future advancements, challenged by a purchaser or a creditor, Chief Justice Brickell adopts the rule declared by the Mississippi court:

"A mortgage to secure future advances, which on its face gives information as to the extent and purpose of the contract, so that a purchaser or junior creditor may, by an inspection of the record, and by ordinary diligence and common prudence, ascertain the extent of the incumbrance, will prevail over the supervening claim of such purchaser or creditor as to all advances made by the mortgagee within the terms of such mortgage, whether made before or after the claim of such purchaser or creditor arose. It is not necessary for a mortgage for future advances to specify any particular or definite sum which it is to secure. It is not necessary for it to be so completely certain as to preclude the necessity of all extraneous inquiry. If it contains enough to show a contract that is to stand as a security to the mortgagee for such indebtedness as may arise from future dealings between the parties, it is sufficient to put a purchaser or incumbrancer on inquiry, and, if he fails to make it in the proper quarter, he cannot claim protection as a bona fide purchaser." Lovelace v. Webb, etc., 62 Ala. 271, 280; Witczinski v. Everman, 51 Miss. 846.

200 Ala.—41

In Collier v. Faulk, supra, Mr. Justice Somerville declared, of mortgages for future advances:

"If they are not tainted with fraud, or bad faith, they are just as valid as if made to secure past indebtedness, not only as between the parties, but also as against subsequent purchasers and incumbrancers, so far, at least, as respects advances made before the equities of such purchasers or incumbrancers have attached. * * * Nor is it necessary in such a mortgage that a definite or specific sum should be stated on the face of the instrument as the ultimate amount intended to be secured. * * * All that can be required is that a mortgage designed to secure such future liabilities should describe the nature and amount of them with reasonable certainty, so that they may be ascertained by the exercise of ordinary diligence on proper inquiry." Collier & Jones v. Wood Bros., 85 Ala. 91, 4 South. 840.

[7] As to the nature of the future advances to be secured, the instrument here in question was more definite than that held sufficient in Collier & Sons v. Faulk & Martin, supra. The terms of the recorded instrument were sufficient to inform creditors inspecting the record and exercising ordinary diligence and prudence of the nature and the extent of the incumbrance held by the McGowin Company. The rule declared in Kirby v. Raynes, supra, is not to the contrary; in that case it is declared not to be necessary that the mortgage express on its face that it was given to secure future advances to make it operate as such security. Such fact may be shown by parol.

The law day of the instrument in question being January 1, 1912, it was not an unreasonable condition that reserved to the mortgagor the use and possession of the personal properties mortgaged; there was no reservation of a prohibited use or benefit of the properties dealt with therein to Donald or to his relatives. By the amendment to its bill, complainant averred that at the time of entering into said contract (that indicated in the several assignments of error), it was agreed and understood between the McGowin Company and Donald that the latter should conduct the business of buying, selling, and exporting lumber and timber, and that the expenses of the business should be paid out of the proceeds of the sales of lumber and timber, the subject-matter of the contract; "that the living expenses of the said Harry G. G. Donald, at least to the extent of $250 per month, should be paid out of said proceeds; that the course which the parties pursued in the matter was designed to permit the said Donald to continue his business and realize great benefit therefrom," and be given "the opportunity of conducting business with a chance of profit, and to realize from the proceeds thereof moneys with which to pay the expenses of his business as well as the living expenses of himself and his family, and at the same time to keep all of his stock in trade so covered by the alleged lien of McGowin Lumber & Export Company as to prevent

any of the other creditors of the said Harry G. G. Donald from subjecting the assets of the said Harry G. G. Donald to the payment of their debts."

[8] As a general rule, the provision in a transfer of property by a person indebted at the time, whereby he reserves or secures a benefit to himself or his family at the expense of his creditors, unless it be consented to by such creditors, is deemed to be evidence of a fraud, either actual or constructive, and renders the transfer liable to be avoided at the instance of creditors. Stokes v. Jones, 18 Ala. 734; Pritchett v. Pollock, 82 Ala. 169, 2 South. 735; McDowell v. Steele, 87 Ala. 493, 6 South. 288. In Howell v. Carden, 99 Ala. 100, 109, 10 South. 640, 644, the legitimate scope of an incumbrance upon personal property, as against the grantor's creditors, is defined to be the bona fide appropriation of the property to secure a debt honestly due, with the proviso that:

"If any part of the purpose of the parties thereto is that it shall avail, or be used for the ease or favor of the grantor, it is void as to his creditors." Reynolds v. Crook, 31 Ala. 634.

The court said:

"Whenever such purpose or a trust for the use of the grantor appears upon the face of the instrument, the court, without looking further, pronounces it void as against the grantor's creditors. Thus a mortgage of merchandise, which expressly or impliedly leaves the mortgagor in possession, and free to make sales from the mortgaged property for his own benefit, in its very nature involves such a reservation of a benefit to the mortgagor as invalidates the instrument, and the court will pronounce it invalid as a conclusion of law. Benedict v. Renfro, 75 Ala. 121 [51 Am. Rep. 429]; Owens v. Hobbie, 82 Ala. 466, 3 South. Rep. 145. If, however, the mortgage of such property provides for the sale thereof by the mortgagor for and on account of the mortgage, and that the proceeds of such sales be applied to the mortgage debt, then such mortgage is not fraudulent on its face. Murray v. McNealy, 86 Ala. 234, 5 South. 565 [11 Am. St. Rep. 33]. A mortgage of personal property cannot be pronounced fraudulent without evidence aliunde to this effect, unless it appears from an inspection thereof that the purpose of the parties embraces the reservation of a benefit to the mortgagor, or that there was an intent to have the transaction go beyond the legitimate object of securing a debt, and to operate, in part at least, to hinder, delay, or defraud the mortgagor's other creditors. Unless such infirmity is disclosed upon the face of the instrument, the question of its validity as against the grantor's other creditors is one of fact, to be determined on the evidence as to the situation of the parties and the circumstances attending the transaction."

In Berney National Bank v. Guyon & Co., 111 Ala. 491, 20 South. 520, it was declared that a debtor, whether solvent or insolvent, who makes any disposition of his property to another, not in payment of his debts, for the purpose of preventing his creditors from subjecting to the satisfaction of their demands at a forced sale, the grantor's property, although it would be thereby sacrificed and such disposition was calculated to have that effect, is guilty of hindering, delaying, and defrauding his creditors. Lehman, Durr & Co. v. Kelly, 68 Ala. 192.

[9] The right of a subsequent creditor to avoid a conveyance as fraudulent depends upon the existence of fraud in the transaction, and the burden of proving fraud rests upon such creditor. Such fraud must be proved; it will not be presumed if the facts and circumstances shown in the evidence may be consonant with honesty and purity of intention on the part of the parties to the conveyance. McCrory v. Donald, 192 Ala. 316, 68 South. 306; Seals v. Robinson & Co., 75 Ala. 363, 370; Elam v. Brewer Lumber Co., 176 Ala. 48, 56, 57 South. 483; Yeend, Adm'r, v. Weeks, 104 Ala. 331, 339, 16 South. 165, 53 Am. St. Rep. 50; Sherrill v. Hutson, 187 Ala. 189, 195, 65 South. 538.

To support the averment as to a salary benefit, the complainant examined Donald, who testified that he had a verbal understanding with Mr. Joseph F. McGowin (president of the McGowin Company), at the time the contract was entered into, that he should draw as living expenses or a salary, $250 per month, out of the business done under the contract. Mr. Buck testified in effect that, in addition to moneys paid others for services rendered, and those expended in operating the business, $250 per month was paid to H. G. G. Donald as one of the necessary expenses of the conduct of such a business; that the manner of making payment of all the expenses incident to the conduct of the business, on the part of Mr. McGowin, was to allow Donald & Co. to pay the same out of said bank account, on McGowin's approval—the method provided by the contract.

The evidence is without conflict that Donald and the McGowin Company operated said business under the first contract (that of February 7, 1908) until its expiration (in January, 1910), and thereafter continued the same business till July 1, 1911, under the instrument of February 10, 1910; that the conduct of Donald's business for the time in question was in consonance with the terms of the instrument under which they operated, and according to the necessity of the case; that the McGowin Company indorsed Donald's notes, which were duly discounted with the City Bank & Trust Company, the proceeds thereof being placed in said bank to the credit of the account of H. G. G. Donald & Co., and that thereafter said account was checked upon only through checks drawn by Donald & Co., countersigned by McGowin Lumber & Export Company; that all timber and lumber purchased by Donald were paid for by check on said bank so countersigned; that the proceeds of all timber and lumber sold by Donald were duly deposited in said bank account in compliance with, and pursuant to the terms of, said contract; that in addition to the purchase price of timber and lumber, and the actual expense of maintaining and handling

the same, paid by Donald's check on said bank, countersigned by the McGowin Company, the expense of operating and maintaining the business, including salaries for superintendency and clerical services, was so paid. Under this latter head, of course, would fall the monthly salary of $250 paid Donald. Was such payment to Donald a benefit that rendered voidable the instrument in question, at the instance of a proper creditor?

It is important that we ascertain the condition of the account between Donald and the McGowin Company, on the date of the execution of said contract of February 10, 1910. It was that Donald then had on hand lumber and timber so acquired under the contract of September 7, 1908; that the amount of the unpaid discounted notes held by said bank, given and indorsed respectively by Donald and the McGowin Company under said written agreement, was about $32,000; that the cash on deposit in bank to Donald's account was about $115; that the boom equipment held under said contract lien was worth not less than $1,495.82, and not more than $6,000; and that the office fixtures and furniture were not more than $250 in value. A wide difference thus existed between the items of assets and indebtedness, and against Donald and in favor of the McGowin Company, by reason of the latter's indorsements and guarantees procured and made under said contract of September 7, 1908. This indebtedness was fixed by the witness at $17,000. Under such state of facts, the equity of redemption sought to be conveyed to the McGowin Company by the second contract, in the office fixtures and furniture and the boom equipment, was without value. It is equally certain that the indebtedness of Donald on said date, due by reason of purchase moneys of timber and lumber, and maintaining and operating expenses of the business, procured and furnished by the McGowin Company through indorsements and guarantees, was largely more than the value of the assets delivered up or paid to the credit of the McGowin Company. The result would be unchanged, though the McGowin Company were charged with the boom equipment, and the office furniture and fixtures, which it never received, and with all sums paid by it to Donald to manage and conduct said business.

[10] Appellant insists that the evidence does not show that the stock of lumber and timber in Donald's possession on February 10, 1910, had been acquired by Donald through payments made with McGowin Company's money or credit, in such manner as to subject it to the terms of the contract of September 7, 1908. This position is untenable. Mr. Donald testified, concerning these properties and transactions, as follows:

"At the time I entered into the agreement of February 9, 1910, I had no property whatever, except the stock of timber and lumber on hand, which had been acquired under the agreement of September 7, 1908, and the boom equipment purported to be mortgaged in and by the last agreement * * * some office furniture and fixtures which were also covered by the mortgage contained in the instrument of September 7, 1908. On February 10, 1910, the amount of my obligations held by the City Bank & Trust Company, which had been indorsed by the McGowin Lumber & Export Company, under the agreement of September 7, 1908, was $32,000. On or about the last day of June, 1911, I turned over to the McGowin Lumber & Export Company the stock of lumber and timber then on hand and the boom equipment, to be credited upon my notes then held by the City Bank & Trust Company and indorsed by McGowin Lumber & Export Company. I did not operate further under the said contract * * * all of the shipments abroad of lumber and timber, and all of the local sales to which I have testified, and all such shipments and sales made by me while conducting the business of H. G. G. Donald & Co. from February 10, 1910, to July 1, 1911, embrace only timber and lumber which had been purchased in the manner which I have described. That is, some of it was purchased by me, and all such purchases were paid for by check on the account of H. G. G. Donald & Co. in the City Bank & Trust Company; the purchases made by the McGowin Lumber & Export Company for H. G. G. Donald & Co. were generally paid for by the Export Company [McGowin Lumber & Export Company], and afterwards H. G. G. Donald & Co., would give their check to the McGowin Lumber & Export Company to cover the purchases. I handled no timber or lumber except that acquired as aforesaid. The stock of lumber and timber on hand February 10, 1910, was all used in making the sales and shipments mentioned, and the notes evidencing the indebtedness which I owed at that time aggregating $32,000 were taken care of out of the said bank account of the said H. G. G. Donald & Co. We did not undertake to separate the transactions under the agreement of September 7, 1908, from those under the agreement of February 10, 1910, but in effect treated the last-mentioned arrangement as an extension" of the former. "The expenses that I have testified to as constituting my office expenses and my boom expenses were necessary in order to handle the said timber and lumber. The timber might be boomed by paying some one else to do it, but an exporter has either to pay some one else or operate the boom himself. The expenses which I incurred and about which I have testified are reasonable, and were actually incurred and paid out. All of the business done by H. G. G. Donald during the period under inquiry is shown by the cashbook, certain sheets of which have been introduced in evidence, and appears from said book that all of the transactions passed through the City Bank & Trust Company. I mean that all moneys received was deposited in that bank to the account of H. G. G. Donald & Co., and that all moneys disbursed was by check on the same account; each check being countersigned by the McGowin Lumber & Export Company."

The further conduct of Donald's business is thus frankly detailed by Donald, as a witness for complainant, as shown by the record:

"Q. Does this book show the true state of that account from time to time as it purports to? (referring to the passbook introduced in evidence, showing the account of Donald & Co. with the City Bank & Trust Company for the period embraced by both contracts under discussion). A. Yes."

Witness, further answering as to the conduct of that business, said:

"This account was kept under an agreement between Joseph F. McGowin and myself to the effect that checks on this account should be signed, 'H. G. G. Donald & Co.,' by me, and countersigned by the McGowin Lumber & Export Company, and the McGowin Lumber & Export Company and I instructed the City Bank & Trust Company that all checks against this account should be signed and countersigned in this way. This agreement was carried out. After the execution of the contract of February 10, 1910, I proceeded to carry on the business of buying and selling and exporting lumber and timber just as I had done under the previous contract of the same character. During the period covered by this contract, I purchased many thousands of dollars worth of both lumber and timber, taking the title thereto in the name of the McGowin Lumber & Export Company. I exported all of the timber and lumber I purchased during this period, except 55,330 cubic feet of the timber and 69,336 superficial feet of lumber, which was the stock on hand June 30, 1911, and was worth a total approximately $14.657.40, and which was taken over by the McGowin Lumber & Export Company. At the end of my operations under this contract there was still in bank several notes which had not been taken up. I do not know the details of them. I also had on hand at that time $14,-657.40 worth of timber. This should have been credited to us as an offset against such notes as they took up. We at that time also had on hand boom fixtures and other appliances used in carrying on this business, which consisted of launch, boom logs and chains, rafting tools, etc. They were all turned over to the McGowin Lumber & Export Company against my liability on unpaid notes. * * * The office fixtures were retained in my office; there was no agreement made about those, as they were simply left in my office. * * * At the time we entered into the contract of February 10, 1910, I had on hand a considerable stock of logs and lumber which had been acquired prior to the execution of this contract. This stock had accumulated in the business which I had conducted under a former contract of the same character with the McGowin Lumber & Export Company, and this stock was treated under the contract of February 10, 1910, just like the stock that was subsequently purchased."

The testimony of Mr. Buck, mainly to like effect, went to show also that said operations of McGowin Company with Donald developed a further indebtedness, due from the latter to the former, under the contract of February 10, 1910; that they frequently checked up the status of that business, so far as concerned the assets on hand and the liabilities indorsed by the McGowin Lumber & Export Company; that this was generally done after most of the shipments; that at no time, in the operations under this contract, did there appear a profit—"there was always a loss"; that no effort was made "to separate the dealings" under the contract of September 7, 1908, from those under the contract of February 10, 1910; that they went right on with the same stock and the same obligations in the bank, operating the business as though there had been but one contract; that all purchases of lumber and timber, expenses of maintaining and operating the boom, and office and other running expenses of the business, were paid by check on said bank account, countersigned by the McGowin Company.

Certain expenses incurred by Donald in the purchase of launches used in the operation of his business were, it appears to us, satisfactorily explained by Donald; that is, that the two launches were necessary to the successful operation of the boom, as a part of its equipment; that he did not know what became of the launch Dot—whether it was destroyed by sinking, or was sold for a sum which was deposited in the company's bank account. As to this no witness testified to facts tending to show a fraudulent disposition of the launch by Donald, or that the McGowin Company knew anything of its disposition if it had been sold. Concerning the launch Bessie W, Donald testified that it was purchased for $1,200, and was maintained as was the boom, and as a part thereof, with funds drawn from said bank account; and that it also was necessary to the successful operation of the boom.

Notwithstanding the fact that the witness Buck had testified that no profits accrued under the agreement, that the business was operated at a loss, appellant insists that profits accrued from certain of Donald's export shipments, or from charters, or from freight or insurance rebates incident thereto. Donald explained this by the statement that though there were profits on some of the sales the general business was operated at a loss; and that what might appear on the books of the company as profit on charters and freight was but the result of an arrangement with the shipping company whereby the freight charges were increased to an amount in excess of the actual rates, and Donald was reimbursed for such excess freight charges by the shipper's check for the amount thereof which he deposited to the said bank account of his company. This arrangement was explained to have been made for a twofold purpose : (1) To strengthen the prices of lumber and timber at the point of destination; and (2) to obtain a reduction in marine insurance on cargo, in manner indicated by the witness. However sufficient this explanation may be considered, no witness testified to profits resulting from such operation. It cannot be gainsaid that if freight charges on lumber and timber transported for them were so increased by the transportation companies at Donald & Co.'s request, or with their consent, and the full amount of such increase or excess was immediately repaid by each transportation company to Donald & Co., and by the latter deposited to its credit in said bank account, then, for all practical purposes, the assets of said Donald & Co. were not affected by the transaction. Without either sanctioning or condemning the practice in question, it is sufficient, in the absence of testimony to the contrary, to say that the effect of such transactions is not further pertinent to the inquiry here.

We hold that the weight of the testimony was to the effect that the lumber and timber on hand with Donald when the second in-

strument was executed was the product of the course of business between Donald and the McGowin Company under the provisions of the agreement of September 7, 1908; that all of the said properties of the said Donald & Co. held by them at the time of the execution of the second or last instrument under which they operated with McGowin Company were worth greatly less than the large indebtedness, then existing, incurred thereunder; and that said stock of lumber and timber, together with the boom equipment and the office fixtures, were subject to the first lien created by and accruing in the operations under, the instrument of September 7, 1908, in favor of McGowin Company. Such being the condition of Donald's assets and liabilities on September 7, 1908, the equity of redemption in the boom equipment and office fixtures, carried into the instrument of February 10, 1910, was of no substantial value, as we have observed, even though all sums theretofore or thereafter by McGowin Company paid to him as its superintendent, as salary, be charged to McGowin Company. Such was the effect of accounts between Donald and the McGowin Company and the City Bank & Trust Company at the close of business on July 1, 1911. As shown by the account, Donald was indebted at the close of the day's business on February 9, 1910, in the total sum of $32,000, and at the close of the day's business on June 30, 1911, more than $39,-000; such indebtedness representing the net liabilities of Donald to the McGowin Company incurred in the conduct of the lumber and timber business under said successive instruments.

[11] When the boom equipment and the launch Bessie W. were taken possession of by the mortgagee, they operated as a credit pro tanto in the discharge of the first mortgage lien thereon, created by agreement of parties under the original instrument. For it is well established that, where other creditors are interested, or in the absence of an agreement to the contrary, if a mortgage lien thereon created by agreement of the same mortgagor, and the latter delivers to him property covered by both mortgages, the reasonable market value of the property or the proceeds of a sale thereof, made pursuant to the terms of the mortgage, must be applied as provided in the instrument first conveying; and if the property so seized or sold is conveyed by only one mortgage, then such property or its proceeds must by the mortgagee be applied to the debt evidenced by the mortgage that constituted a lien on said property. This is but saying that money received from a particular source or fund shall be applied as payment pro tanto to the relief of that source or fund. Nolen v. Farrow, 154 Ala. 269, 45 South. 183; Darden v. Gerson, 91 Ala. 323, 9 South. 278; Strickland v. Hardie, 82 Ala. 412, 3 South. 40; Pearce v. Mills, 190 Ala. 616, 67 South. 581; Nelson v. Holcomb, 187 Ala. 119, 65 South. 773; Aderholt v. Embry, 78 Ala. 185; Levystein v. Whitman, 59 Ala. 345. The lumber and timber on hand at the expiration of the first agreement, together with the other properties embraced therein, being incumbered by purchase money, or other prior liens, to the amount of their market value, the only property of value embraced in, and subject to, the lien created by the last instrument, was the timber and lumber acquired by Donald and the McGowin Company under the terms of such last instrument.

The credit and moneys of the McGowin Company formed the basis of the business operations of Donald, and entered into the full purchase price of all the timber and lumber in Donald's hands on the execution of the second instrument, as well as into that of the lumber and timber acquired by that company, and on hand upon the termination of its business on July 1, 1911. And the question is presented in this case whether the principle recognized and clearly stated in Adkins v. Bynum, 109 Ala. 281, 19 South. 400, has application.

For a fuller understanding of that decision, we will first note other holdings, as to a class of conveyances of property by insolvent debtors which have been upheld against the attacks of creditors. For example, that an insolvent debtor may convey his homestead; for the all-sufficient reason that by such conveyance the creditor is not hindered, delayed, or defrauded in the collection of his debt; the creditor could not subject the homestead to his debt were it retained by the debtor. Cox v. Birmingham Dry Goods Co., 125 Ala. 320, 28 South. 456, 82 Am. St. Rep. 238; Kennedy v. First National Bank, 107 Ala. 170, 18 South. 396, 36 L. R. A. 308; Nance v. Nance, 84 Ala. 375, 4 South. 699, 5 Am. St. Rep. 378; Fellows v. Lewis, 65 Ala. 343, 39 Am. Rep. 1. On like principle, a purchase-money mortgage, for personal property, given before a lien of the landlord has attached, was upheld in Bingham v. Vandegrift, 93 Ala. 283, 9 South. 280; Glass v. Tisdale, 106 Ala. 581, 19 South. 70. Mortgages by insolvent debtors for advances, provender, or fertilizers to be used in the making of a crop, have been sustained and held not fraudulent as to creditors. Perry Ins. & Trust Co. v. Foster, 58 Ala. 502, 29 Am. Rep. 779; Pugh v. Harwell, 108 Ala. 486, 18 South. 535; Kidd v. Josiah Morris & Co., 127 Ala. 393, 30 South. 508; South Ala., etc., Co. v. Garner, 112 Ala. 447, 20 South. 628; Howell v. Carden, supra. The vendor's lien was held to prevail over the claim of homestead in Stanley v. Johnson, 113 Ala. 344, 21 South. 823; Cook v. Kelly, 75 South. 953.[4] Other conveyances by insolvent debtors, under such circumstances that the creditors could not have subjected the property had it not been conveyed, have been upheld. Adkins v. Bynum, supra;

[4] Ante, p. 133.

Builders' etc., Co. v. First National Bank, 123 Ala. 203, 26 South. 311; J. M. Card Lumber Co. v. Ozment, 187 Ala. 237, 65 South. 792. See, also, Southern, etc. Co. v. Hammond, 11 Ala. App. 491, 66 South 941. In the Adkins-Bynum Case, supra, a chattel mortgage was given to secure the payment of a stock of merchandise presently sold by the mortgagee to the mortgagor. The holding was that such sale and security of the purchase price thereof was not within the rule that declares a chattel mortgage fraudulent as to other creditors, where the mortgagor is allowed to continue in the possession of the goods and sell them on his own account. The reason for the decision is that such purchase-money mortgage conveys no property which could have been subjected to the payment of the mortgagor's debts by a creditor, and that there is no fraudulent intent on the part of the parties to the mortgage. Chief Justice McClellan said:

"It is laid down in the books as a general proposition that the concurrence of three elements is essential in the constitution of a fraudulent conveyance; that is to say, before a conveyance can be declared fraudulent it must be made to appear that there is: (1) A creditor to be defrauded; (2) a debtor intending to defraud; and (3) a conveyance of property out of which the creditor could have realized his claim or some portion thereof. 8 Am. & Eng. Encyc. of Law, p. 749. * * * In the absence of the sale and mortgage, the subject-matter is not and would never become the property of the debtor out of which the creditor could realize his claim or any part thereof. How then is he injured? How is he defrauded by the transaction? How can it be said that by purchasing property upon a credit, parting therefor with nothing which the creditor could have subjected to his demands, and, as a part of the sale and purchase, conveying it back to the seller as security for the payment of the purchase money, the debtor has hindered, delayed or defrauded his creditor, when, obviously and confessedly, had nothing of this been done no shadow of right would have ever existed in the creditor to pursue and subject that property? Indeed, not only is the property in such cases not in the debtor before, and would never have been in him in any sense or for any purpose but for such sale and simultaneous mortgage back, but in its final analysis the transaction cannot be fairly said to invest in him for even a moment of time any beneficial ownership and title. He is a mere conduit for the transmission of the title from the seller as absolute owner through himself and back to the seller as owner upon condition; and what he acquires in the premises, the only beneficial interest or estate that he does acquire is a mere equity of redemption, in substance and reality only the right to become the owner of the property by paying for it. And so far from his creditor being injured or defrauded, he is affirmatively benefited to the extent of the value of this equity of redemption, and he may well be also benefited through the opportunity which this use of another's property affords the debtor to realize profits which the creditor may subject, or which the debtor may voluntarily apply, to the satisfaction of the debt."

In South Alabama Oil & Fertilizer Co. v. Garner, supra, the court observed:

"At the time of the purchase of the guano, Lisenby was insolvent, and this was known to the vendor. The bill of exceptions shows * * * that the guano was purchased by Lisenby, and it was sold to him, for the purpose of making a crop for himself. After the levy, upon the filing of the bond as provided by statute, the guano was delivered to claimant, who subsequently sold it to the wife of Lisenby, and by her it was used on her land. Upon this statement of facts, the appellant contends that the conditional sale was made to hinder, delay and defraud the creditors of Lisenby, and is void as to them. Out of what has the creditors been defrauded by this transaction? Before the sale to him, the debtor had nothing, subject to the creditors' demand. By the terms of the sale, the guano was to be used by the debtor in making a crop for himself. He could not dispose of it by sale or otherwise, under the agreement, other than making a crop. Any benefit to the debtor to be derived from the purchase of the guano resulted equally to the benefit of his creditors."

The same reason obtains in favor of the instrument attacked by the bill in the instant case as in Garner's Case. No profits accrued to Donald from the business financed by the McGowin Company. Had he realized any such profits—been entitled to credit on such account—to that extent the creditors would have been benefited, and this contingency afforded them no tenable ground upon which to challenge the conveyance that resulted in such profits.

In Gillespie v. McClesky, 160 Ala. 289, 49 South. 362, the fact is pointed to that the mortgage upheld in Adkins v. Bynum, supra, specifically provided, in case the mortgagee were to sell the goods, that he should apply the proceeds realized therefrom, from time to time, to the payment of the mortgage, and that the mortgage was for the entire amount of the purchase money. Such in effect were the provisions of the instrument in the instant case. So far as the evidence discloses, if sales were made, and the proceeds not so applied to the purchase-money indebtedness and other liabilities necessarily incurred in the conduct of the business, it was without the knowledge and consent of the mortgagee.

In the Ozment Case, supra, Mr. Justice McClellan reaffirmed the rule of the Adkins-Bynum Case, supra. The contract there upheld was for the sale of standing timber, with the right of cutting and manufacturing the same into lumber by the insolvent purchaser. By the terms of the conveyance in question, in Ozment's Case, the vendor retained a lien on the timber and on the product manufactured therefrom, though the insolvent purchaser was in said contract of purchase authorized to sell the lumber in the usual course of his mill business. That case involved the same opportunity to earn a profit and maintenance from the business that characterizes the instant case. If upheld in one case, it must be upheld in the other.

In Southern, etc., Co. v. Hammond, supra, the Court of Appeals held that where a debtor, in order to procure material and mon-

eys wherewith to execute his construction contract with the constructor, agreed with a third party to advance him, by giving such party an order on the constructor for all sums becoming due under the contract, and this order or assignment was accepted by the constructor, such assignment is valid. And the fact that, during the construction or installation of the plant contracted for, the party making the advances of moneys for materials and labor necessary to accomplish the work allowed the defendant-contractor to superintend and do manual labor therein, and to receive therefor a weekly wage of $6 during the time of the construction or installation, was declared not to amount to the reservation of a benefit under the statute (Code, § 4287) that vitiated the assignment. As in the instant case, the insistence was made in Hammond's Case, that the expense of maintenance of the superintendent, Gillespie, while directing and assisting in the installation of the heating plant, subjected the assigned contract to the vitiating influence of the statute.

[12] However that may have been in the Hammond Case, it follows that if the contracts or purchase-money lien instruments upheld in the Ozment and Adkins Cases were found not to have been within the inhibition of the statutes, not conveying properties subject to the satisfaction of creditors' debts, it cannot here be held that the instrument challenged was fraudulent and void as to complainant, under section 4293 of the Code. This conclusion squares with the fundamental reason on which the foregoing decisions rest—that a necessary element of a fraudulent conveyance is that the debtor must have conveyed some substantial portion of his property that was subject to the satisfaction of the creditors' debts. The Christian & Craft Grocery Co. v. Michael & Lyons Case, 121 Ala. 84, 25 South. 571, 77 Am. St. Rep. 30, is not in conflict with the Ozment and Adkins Cases. In the Ozment Case, the purchase-money lien was recognized and protected, in the operation of the mill business, converting the timber into logs and lumber, and by its sale in due course of business of property that was not subject to the debt of the attacking creditor. In the Christian & Craft Grocery Co. Case, the logs manufactured into lumber were obtained in part from the lands described in the mortgage and in part from other sources. The manufactured product of such logs was shipped to the Christian & Craft Grocery Company, and by it sold, the proceeds being applied largely to unsecured accounts of the defendant with claimant for supplies and advances, and to orders given by the defendant to third persons or to the claimant, only a small portion of such proceeds being applied to the mortgage debt. Such conveyance, and the conduct of business thereunder by the mortgagor and the mortgagee, to the benefit of the former, showed that the mortgagor had reserved a benefit; and this rendered the conveyance void under the statute. To safeguard the decision against the influence of the Adkins and Ozment Cases, the court said:

"There is no evidence that the logs and timber levied upon under plaintiffs' execution were cut from the land described in the mortgage. Nor is there any evidence in the case that the property levied on was the product of, or manufactured from, logs owned by defendant mill company at the time of the execution of the mortgage, or until after default by the mortgagor under the terms of the mortgage. So far as the record discloses, it was after-acquired property, and acquired after default made by the mortgagor. It is said by this court in Burns v. Campbell, 71 Ala. 288: 'So, a mortgage of subsequently acquired property, especially by general terms of description, which is not the product, increase, or accretion of something already owned by the mortgagor, amounts to nothing more than a mere agreement to give a further mortgage. It confers no specific lien on such after-acquired property'—citing Herman on Chat. Mortg. § 46; Anderson v. Howard, 49 Ga. 313; Otis v. Sill, 8 Barb. 102; 2 Kent's Com. 468."

When the case of Benedict, Hall & Co. v. Renfro Bros., 75 Ala. 121, 51 Am. Rep. 429, cited by appellant, is carefully considered, it will be seen not to be in conflict with the authorities upon which we have rested this decision. There the insolvent debtors, Crumley & Co., mortgaged their large stock of merchandise, some of which was of a perishable nature, to secure a debt to Renfro Bros., who knew that the mortgagor was financially embarrassed. In the mortgage, the express power to sell the merchandise or any of it was not retained by the mortgagor, but the merchandise was left in his possession; and under such circumstances as those, it was held to be the clearly implied intention of the parties that the mortgagor should remain in possession until the law day, with the power of disposition of the mortgaged property and the authority to appropriate the property or its proceeds at option. Yet, in this decision, Mr. Justice Somerville expressly reserved the question with which we are now dealing. He said:

"We are not to be understood as intimating, in this opinion, that a mortgage of merchandise would be rendered conclusively invalid, where the mortgagor is in good faith left in possession of the goods with power to sell for the exclusive use of the mortgagee, holding the proceeds of sale for his benefit. In such case he may well be deemed the mere agent of the mortgagee, acting for him and in his behalf."

An express provision of the mortgage in the instant case properly safeguarded the properties against diversion from the payment of the purchase-money debt and the expenses incident to a reasonable operation of the business to that end. Benedict, Hall & Co. v. Renfro Bros., 75 Ala. 129, 51 Am. Rep. 429. It will be noted that the mortgage challenged in Wiswall v. Ticknor, 6 Ala. 178, stipulated that the mortgagor should be entitled to the use and possession of the

personal property, among which was "a stock of groceries, chandlery, goods, wares and merchandise"; and that he had the right to sell and dispose of the property until default made in the payment of the mortgage debt. The opinion points to the fact that it was not averred in the answer that the stock of goods had from time to time been replaced, purchased by the mortgagee, and replaced with his own money. In the second decision of that case (Ticknor v. Wiswall, 9 Ala. 305, 309, 310). Judge Goldthwaite said:

"In Jones v. Huggeford (3 Metc. 515), it is said: 'The party who alleges the transfer to be fraudulent, and merely colorable, may submit to the jury all the supposed badges of fraud arising from the form of the conveyance, and the stipulations of the vendor, which tend to raise the presumption of fraud. But they will be open to explanation, and may be shown to be consistent with honesty of purpose and good faith, in the parties to the contract.' We have before suggested, the difficulty there is in conceiving any reason for such a reservation by a debtor, when on the eve of admitted insolvency, and we think it rests with the creditor taking the conveyance, with such reservations, under such circumstances, to show that the transaction is explained by other facts and circumstances, so as to rebut the suspicion of fraud. Such was the decision made by us in Marriott v. Givens, 8 Ala. R. [694]."

It is not necessary to advert to that other line of authority, to the effect that where there was a fraudulent conveyance, and the grantee therein pays to a bona fide creditor of the grantor the fair and reasonable value of the properties transferred in such conveyance, such grantee is relieved from further liability. Cottingham v. Greely Co., 129 Ala. 200, 206, 30 South. 560, 87 Am. St. Rep. 58; Lightman Bros. v. Epstein, 164 Ala. 660, 671, 672, 51 South. 164; Miller v. Rowan, 108 Ala. 98, 100, 19 South. 9; Mobile Savings Bank v. McDonnell, 89 Ala. 434, 442, 8 South. 137, 9 L. R. A. 645, 18 Am. St. Rep. 137; Hubbard v. Allen, 59 Ala. 283. Under the evidence here, it is shown that the bank, the vendors of the timber, and those employed and engaged in the reasonable conduct of the business, were bona fide creditors of Donald & Co. The evidence further shows that the sums expended in the conduct of the business, including the salaries the payment of which is challenged, were but necessary and reasonable outlays in the operations involved; and that all such sums were paid by check on said bank, drawn by Donald & Co. and countersigned by McGowin Lumber & Export Company. If the salary paid to Donald as superintendent of Donald & Co. were charged to the McGowin Lumber & Export Company, there would be a large excess of liabilities, on accounts of payments by McGowin Company to bona fide creditors of Donald & Co., over the total of the assets by Donald turned over to the McGowin Company on the expiration of the contract.

Whether or not the principle last announced be given application, the decree of the circuit court is sustained, and this, on the authority of Adkins v. Bynum, supra, and J. M. Card Lumber Co. v. Ozment, supra, and authorities of like import.

The judgment of the circuit court is affirmed.

Affirmed.

ANDERSON, C. J., and MAYFIELD and SOMERVILLE, JJ., concur.