189 So. 737

**BOGER v. JONES COTTON CO. et al.**

**8 Div. 965.**

Supreme Court of Alabama.

May 18, 1939.

Rehearing Denied June 22, 1939.

See, also, 234 Ala. 103, 173 So. 495.

Wert & Hutson and S. A. Lynne, all of Decatur, for appellant.

Harris & Harris and Eyster & Eyster, all of Decatur, for appellees.

182

**BOULDIN, Justice.**

The original bill was filed by appellant, W. A. Boger, as trustee in bankruptcy of the estate of Alabama Cotton & Grain Company, a corporation, bankrupt, against appellee, Jones Cotton Company, a co-partnership, to set aside a mortgage given by the bankrupt covering all its real property, and to subject the property to payment of claims of creditors of the bankrupt.

Among the grounds of attack was non-compliance with the statute governing the execution of a mortgage of lands by a corporation. Code, § 7015, Subdivision (3). This aspect of the bill was before this court on former appeal. Following former decisions we held that creditors of a mortgagor cannot set up these statutory provisions, that they are for the protection of stockholders, that the trustee in bankruptcy, as the representative of creditors, cannot take advantage of same, and that the bill was demurrable for misjoinder in bringing in as a party complainant, a stockholder, not shown to have other interest than to aid the trustee in bankruptcy to reach the property for the benefit of creditors.

The present appeal is from final decree on pleadings and proof denying complainant relief.

During the cotton moving season of 1929, Alabama Cotton & Grain Company sold and delivered to Jones Cotton Company, cotton merchants, 2400 bales of cotton. The business was conducted on the general lines of business between the parties in former years. The price of the cotton was not fixed at the time of the several deliveries. It was carried by the buyer, on call. The seller retained the right to call for settlement on a future date of his own selection. The basis upon which the price was to be determined on such call date was fixed at the time of each delivery.

This basis was so many points off the price of cotton futures on the New York Exchange at the time of the call. The price of futures of a specified month, termed the call month, was stipulated at the time of delivery. If the call was not made before the arrival of the notice date for such call month, the seller, with the consent of the buyer, could transfer to a later call month, and so extend the period for making a call for settlement.

Upon each delivery of cotton the buyer made a provisional advancement to the seller equal to the then market price of the cotton, less about one cent per pound, reserved as a margin for the buyer's protection in case a decline in the market price of cotton should result in over-payment when the price of the cotton was finally fixed.

In case falling prices should deplete this margin, the seller was obligated on demand, to make cash deposits from time to

time, to keep the margin intact. On failure so to do, the buyer had the privilege of closing the transaction, and settling on a current price basis. This contingency did arise, and the buyer made demand for cash deposits, otherwise viewed as a refund of a portion of the money advanced.

The seller, thereupon, proposed to execute a mortgage on its real estate as security for any losses growing out of the advancements and the holding arrangement above outlined.

The mortgage here in question was, thereupon, executed of date, February 12, 1930. The mortgage recited an indebtedness secured thereby in the sum of $25,000. No existing indebtedness had accrued at the time. As a fact, if closed out at the time, there was still a small balance, of the reserved margin, and there would have been no losses. The mortgage, in fact, was security in lieu of cash deposits, a protection against losses from further decline of cotton, pending calls at the option of the seller as to time.

A present consideration for the mortgage was the surrender of the contractual right of the buyer to close the transactions for want of margins.

As time went on the call months were transferred to later months with consent of the buyer. The seller made calls from time to time and settlements were made accordingly. When finally closed in the fall of 1930, the accounts showed losses, or over-advances so to speak, of something more than $20,000.

Another feature of this course of business empowered the buyer, in consideration of foregoing any interest charges on the advancements, and other outlays for holding cotton, to sell the cotton as his own at will. Most of this cotton was sold prior to the date of the mortgage. To stabilize his profits in business of this character, to protect himself in case of a rise in the price of cotton after he had sold it and prior to the call day fixing the price he must pay the seller, the buyer hedged by dealings in futures on the New York Exchange. The seller had no connection with these hedging transactions.

It further appears the seller also dealt in futures on the Exchange. These dealings were conducted on the Exchange in the name of Jones Cotton Company, the buyers, and through their brokers. This, however, was for the accommodation of their customer, kept on a separate account, and no part of the gains or losses to be shared by Jones Cotton Company. No margins, it appears, were put up for their protection, because in the initial transaction, the margin on the cotton in their hands was adequate security, and in later transaction there was a margin of profit. When the transactions were closed, the profit balance, some $990, was, by acquiescence of Alabama Cotton & Grain Co., applied as a credit on the mortgage debt.

Appellant argues that looking at the entire picture the mortgage was in fact given to secure losses on these latter dealings on the Exchange, that they were in fact wagering transactions, illegal, and injurious to other creditors of the Grain Company, and the mortgage is, therefore, subject to attack on behalf of such creditors.

The record, by direct uncontradicted testimony, negatives this view, discloses the real consideration for the mortgage was to cover losses wholly unconnected with these dealings as above indicated. On the whole, Jones Cotton Company suffered no losses from extending their credit to the Grain Company in its dealing in futures.

The main insistence of appellant on this appeal is that the course of business pursued was a speculative or wagering transaction, viewed as a whole; that it was ultra vires, and fraudulent as against existing creditors of the mortgagor.

Obviously, there are speculative features in sales of cotton on call. The ultimate price at which the cotton is bought and sold is contingent on the course of cotton prices in the future.

The seller draws for present uses the greater portion of the value of the cotton at the time of delivery but retains the chance of obtaining a greater price if cotton goes higher later on, but he also takes the chance of having to refund a portion of the provisional advance if cotton goes down in price.

The buyer, exercising his right to sell the cotton at any time before call, takes the chance of having to pay a greater price than he got for it. This hazard was safeguarded here by hedging on futures.

However, this custom of business had obtained between these parties for many years, and is shown to have widely obtained generally in the cotton trade.

In South Carolina Cotton Growers' Coop. Ass'n v. Weil et al., 220 Ala. 568, 126 So. 637, this court considered this course

of business quite fully. The facts of the case were in most respects like unto this. The case involved the validity of the transaction as between the parties thereto. With full citation of authority we held such transaction lawful, and not a wager; that the hedging operations of the buyer did not stamp it as a gambling transaction.

The Alabama Cotton & Grain Company had corporate power "To buy, sell, deal in, and handle in every way, lint cotton." This obviously carried the power to deal in cotton according to the customs of the trade, if not unlawful.

We, therefore, hold the transaction was not a wager or ultra vires; that the demand secured by the mortgage was a lawful obligation of the mortgagor. There is no question now of the validity of a mortgage to secure future advances, though uncertain in amount. A contingent liability to arise from future operations under an executory contract then existing, or as modified at the time, may be secured by mortgage on like principles.

The point is made that the officers of the corporation were without authority to execute this mortgage for that the resolution of the directors recited it was to secure an indebtedness to the mortgagee of $25,000, and the notices to stockholders were to like effect.

It nowhere appears that the directors and stockholders were not fully informed of the real consideration for the mortgage. They raise no question of the kind. This contention, therefore, comes back to the question decided on former appeal, namely, that creditors are not concerned with the resolutions and the like leading to the execution of the mortgage. It is not a question of ultra vires, the doing of business outside the corporate powers, but one of execution of the mortgage by the corporation.

What we have written on the subject of ultra vires is not meant to imply that creditors of a corporation may avoid transactions of the corporation on that ground alone, and without regard to the question of fraud upon creditors in the particular transaction. See, Force v. Age-Herald Company et al., 136 Ala. 271, 33 So. 866; 13 Am.Jur. 792, § 763; 4 Thompson on Corp. 621.

Since we find this transaction not ultra vires, it is unnecessary to consider how far ultra vires action may enter into the inquiry of fraud vel non.

The question of fraud in this case is to be considered as though the seller were an individual.

As for actual intent to hinder, delay or defraud the creditors of the seller on the part of either the seller or the buyer, there is no evidence of same in the record. For all that appears the parties were engaged in a lawful business enterprise, each seeking to conduct a successful business, not to the hurt of creditors, but to meet obligations.

The mere fact that the face of the mortgage exceeded the liability it was intended to secure, when such liability became ultimately fixed, did not stamp it as fraudulent as to existing creditors. A simulated or grossly excessive amount in the face of a mortgage to secure future advances, evidencing an intent to shield the property of the mortgagor against existing creditors does not appear in this transaction. Manchuria S. S. Co. v. Harry G. G. Donald & Company et al., 200 Ala. 638, 77 So. 12.

Finally it is argued this mortgage should be declared a general assignment, as defined by Code, § 8040.

It appears the mortgage covered substantially all the property of the mortgagor, not pledged to secure other debts to the amount of their value.

But as shown this was not a mortgage to secure a preexisting debt, but upon a present consideration.

No indebtedness had accrued at the date of this mortgage, and the contractual status up to that time contemplated no indebtedness. The seller, if he desired to keep his call rights intact, was obligated to put up margins. If he failed so to do, the buyer was secured by his right to close out the transaction before any debt arose.

The contractual status was altered in consideration of the giving of the mortgage. The buyer surrendered his former safeguards against loss and substituted the mortgage, relieving the seller of the present obligation to put up margins.

Such a mortgage is not a general assignment. Collier & Jones v. Wood Brothers, 85 Ala. 91, 4 So. 840; Manchuria S. S. Co. v. Harry G. G. Donald & Co., supra.

The decree was in accord with the views herein expressed.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.